**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| SHANITA L. REDD on behalf of a MINOR (M.R.) and SHANITA L. REDD, Individually, )<br><br>Plaintiff, )<br><br>vs. )<br><br>PARKVIEW HEALTH SYSTEMS, INC. d/b/a PARKVIEW HOSPITAL RANDALLIA and PARKVIEW BEHAVIORAL HEALTH and CHAD BIDDLE, individually. )<br><br>Defendants. ) | Cause No. _____ |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Shanita L. Redd on behalf of a Minor (M.R.) and on behalf of herself, by counsel, for her Complaint and Demand for Jury Trial on behalf of a minor and herself, state as follows:

**NATURE OF CLAIM**

(1) This action is brought to redress a deprivation of civil rights and to remedy discrimination on the basis of race relative to terms, conditions, and privileges of contract for public services in violation of Section 1981 of the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. 1981 ("Section 1981"). This is also a cause of action for violation of rights provided by Indiana Common Law, pursuant to the supplemental jurisdiction of the Court, 28 U.S. 1367(a).

(2) Injunctive and declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. 1981a, and state law relating to Indiana Common Law Claims.

## JURISDICTION AND VENUE

(3) The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a) (3)-(4).

(4) The unlawful practices complained of herein occurred within Allen County, State of Indiana, therefore, venue is proper in the Northern District of Indiana.

## PARTIES

(5) Plaintiff Shanita L. Redd ("Redd"), at all times relevant to this action, was a resident of the City of Fort Wayne, Allen County, Indiana. The Minor M.R., at the time of the incidents complained of herein, was eight years old and resided with his mother, Redd. Redd and the Minor M.R. are African Americans.

(6) Defendant Parkview Health Systems, Inc. ("PHSI"), at the time of the incidents complained of herein, was an Indiana Corporation. Defendant provided a variety of healthcare services to the public through different organizational names, such as Parkview Hospital Randallia ("PHR") and Parkview Behavioral Health ("PBH"). Defendant's principal office is located in Fort Wayne, Indiana. Defendant, at the time of the incidents complained of herein, provided behavioral healthcare services to the public. Defendant Chad Biddle ("Biddle"), at the time of the incidents complained of herein, was employed by Parkview Health Systems and worked at Parkview Behavioral Health. Biddle is an adult white male. Biddle and had an estimated weight of about 260-270 pounds and an estimated height of about 5'10 to 6'0 tall, at the time of the incidents complained of herein.

**BACKGROUND FACTS**

(7)  Redd and M.R. are both Black or African Americans. M.R. was born on December 24, 2012. M.R. suffers from severe autism. M.R. was initially diagnosed with autism in 2018 at age 6. In 2019, Redd took parent/caregiver training beginning from Great Heights ABA (Applied Behavioral Analysis) located in Fort Wayne, Indiana. The parent/caregiver training took place at the facility, in the Redd home, and in the community. While Redd participated in the parent training at the ABA site, M.R. received therapy.

(8)  People go to Parkview Behavioral Health ("PBH") for short term psychiatric stabilization treatment referred to as an Acute Inpatient Stay. Access to PBH is based on whether the treating Psychiatrist at Parkview Hospital Randallia ("PHR") determines that a referral to PBH is necessary.

(9)  In December 2019, before M.R.'s birthday, Redd sought services for M.R. from PHR. Redd and M.R. were referred to PBH for a short-term psychiatric stabilization (Acute Inpatient Stay) visit. In January 2020, Redd again took M.R. to PBH for a short-term psychiatric stabilization treatment.

(10) On 4/29/2021, Redd took M.R. to PHR for an emergency psychiatric evaluation because her son was experiencing suicidal thoughts. Redd and M.R. were referred to PBH for treatment.

(11) On 5/1/2021, while being treated at PBH, M.R. had a meltdown. M.R. was restrained by the neck in a physical hold by an adult white male employee named Chad Biddle ("Biddle"). In response, M.R. bit Biddle on his arm. Biddle lost his temper and

then slammed M.R.'s head into a wall. After being slammed headfirst into a wall, M.R. was placed in an isolation room by himself.

(12) Redd was later called by PBH and told that M.R. was in isolation. Redd came to visit M.R. later that day and discovered that M.R. was still in isolation. Placing a child in isolation was only supposed to be for a brief period of time. Redd was very upset. Redd was taken to the isolation room where M.R. was being secluded. After a staff person at PBH opened the door of the isolation room, Redd found M.R. on the floor with his eye swollen shut, his lips busted and bleeding, and scrapes around his eye. No one at PBH had provided any medical treatment to M.R. while he was in the isolation room.

(13) M.R. repeated, as if a broken record, that he was *"deathing"* as he struggled to stand up. M.R. expressed the belief that he was dying. Redd felt a profound sense of anxiety for her battered and injured son while she began to provide first aid to him. Redd also discovered that M.R. had not been given lunch or water while he was in the isolation room.

(14) Redd demanded that M.R. be given food and water, both of which were brought to them. Redd requested to speak to the on-call supervisor about what had happened to her son. Redd was told and assured by the on-call supervisor that M.R. would be kept separate from the employee (Biddle) who injured him. Redd was also told that Biddle would be placed on a different unit where Biddle would not encounter M.R.

(15) On 5/2/2021, Redd went a couple hours early for her morning visit with M.R. Redd discovered that M.R. was on the unit with Biddle. In disbelief and fearing for the physical and mental health of her son, Redd complained about the breach of trust and safety for her son and then took her son home.

(16) Before 5/1/21, M.R. allowed his mother, Redd, to hug and kiss him. Before 5/1/21, Redd was the only person whom M.R. showed affection. Before 5/1/21, for all of his life, the bond between Redd and M.R. was always close. After 5/1/21, M.R. would not accept hugs or kisses from his mother. After 5/1/21, M.R. became a different person. M.R. began urinating on himself all the time. M.R. began to have bathroom accidents during the day at school, at ABA therapy in the afternoons, and while asleep at night at home. M.R. also became increasingly agitated. M.R.'s behavior became increasingly violent. Redd became the target of M.R.'s violent behavior.

(17) In an attempt to reverse the violent behavior changes in M.R., Redd increased M.R.'s services, including individual and family therapy, respite care, behavior consulting in addition to his existing wraparound services, psychiatry appointments, and skills coaching. Despite all of these efforts to bring M.R. back to where he was before 5/1/21, M.R.'s expression of physical aggression and destructive behavior did not abate but increased significantly over the next several months. Intensive outpatient services were not working.

(18) On 2/18/2022, M.R. was taken to PHR by police officers for an emergency psychiatric evaluation after he attacked his mother in the car and threatened to kill her for playing the wrong Michael Jackson song. PHR referred M.R. to PBH for admission. Redd was assured by PHR that M.R. and Biddle would not be in the same ward during M.R.'s treatment. Redd was also assured by PBH upon her arrival that M.R. and Biddle would not be on the same ward.

(19) Redd requested in writing that M.R. would not be placed on the same ward as Biddle. PBH officials refused to guarantee in writing but verbally stated that they

would keep M.R. and Biddle separate. Redd was told by PBH that they could not legally put the assurance in writing.

(20) However, because PBH had Biddle working on the same ward as M.R. the day after the incident involving Biddle occurred in May 2021, Redd did not feel confident that PBH would provide a proper safety net between M.R. and Biddle. Redd did not want to risk placing M.R. in a situation that could potentially further contribute to the violent behavioral changes experienced by M.R. after the 5/1/21 incident with Biddle. Therefore, Redd felt compelled to take M.R. home.

(21) On August 23, 2021, Redd filed a Complaint of Discrimination with the Indiana Civil Rights Commission ("ICRC") based on racial discrimination in a public accommodation. Redd alleged in her complaint that her minor child was physically assaulted, while a patient with PBH, by an adult white male employee. Redd also alleged her belief that white patients were not treated in the manner in which her child, M.R., was treated. On 2/22/22 and 10/31/22, ICRC issued a Notice of Finding probable cause that the state anti-discrimination statute prohibiting racial discrimination in public accommodations had been violated.

(22) On 3/1/2022, M.R. was again taken to PHR by police officers for another emergency psychiatric evaluation after attacking Redd in the car on the way to school and threatening to kill Redd because she would not return home to pack him a lunch. This time the attack resulted in one of Redd's fingers being fractured. While Redd and her grandmother waited in the Lobby, a staff employee with PHR approached them first during midmorning and later around noon. In the first meeting, Redd provided background information to the staff member, including the incident of 5/1/21.

6

(23) In the second meeting, the staff member told Redd and her grandmother that M.R. could either go to PBH or other facilities that may be able to help M.R. but that those facilities were located in other cities. Redd was told that PBH could not provide her with anything in writing that M.R. and Biddle would not be in the same area, although the staff member "was sure that [Biddle] had been instructed to stay away from M.R." Redd and her grandmother were also refused a program schedule because "that was considered something in writing".

(24) The PHR staff member also stated that PBH knew that Redd "raised a stink" about the incident with Biddle the previous year and that they would not want that to occur again. After a sequence of back-and-forth conversations between PHR and PBH, Redd and her grandmother were told that the PHR Director had consulted with Parkview legal staff, and the legal staff advised the Director not to allow M.R.'s admission to PBH. Redd expressed frustration at being told this denial of services in a situation where M.R. was exhibiting an escalating level of violent behavior that endangered both her and her minor son.

(25) On 3/2/2022, on or about 3:00 am, while M.R. was still at PHR, a PBH Technician visited Redd and reaffirmed that M.R. would not be admitted to PBH because a PBH Psychiatrist stated that M.R. did not meet the criteria for admission. Redd reminded the Technician about M.R.'s dangerous behaviors, including the threats to kill his mother. The Technician reaffirmed that M.R. would not be admitted to PBH and attributed M.R.'s behaviors to his Autism diagnosis.

(26) Redd requested the Technician provide something in writing from the PBH Psychiatrist of what was told to Redd. The Technician refused to make the request to the

Psychiatrist. The Technician told Redd that M.R. was being discharged and that Redd needed to take M.R. home.

(27) Redd stated that it was unsafe for M.R. to ride in her vehicle and requested a ride for M.R. with a Parkview police officer. Redd made this request based on suggestions made by some of the nurses at PHR because that had been done with other patients. The PBH Technician told Redd that they could not arrange that. PHR did not refer Redd and M.R. to PBH for admission for treatment. PHR recommended that Redd continue outpatient services and sent Redd and M.R. home without any referral for treatment at PBH.

(28) On 3/29/2022, Redd again needed to make another visit to PHR for an emergency psych evaluation. This visit to PHR was necessitated after M.R. attacked Redd while she was sleeping on the couch during the night. M.R. hit Redd in the back and arm with a metal security bar and openly said he was trying to kill his mother. Redd did not receive a referral to PBH from PHR. PHR recommended continuing outpatient services and sent Redd and M.R. home.

(29) On 4/15/2022, M.R. became angry and, again, attacked his mother. This attack occurred while Redd was driving home, which created a dangerous situation. M.R., in an outburst of anger, after Redd modified M.R.'s request about a grill cheese sandwich, unfastened his seatbelt and began hitting his mother on the arm. After Redd pulled into a parking lot, M.R. began pulling her hair and punching her in the head. Redd managed to pull away from M.R. and exited the vehicle while locking M.R. in the vehicle.

(30) While Redd waited on help to arrive from family members whom she called, M.R. climbed into the front seat, ripped off the rear-view mirror and used the mirror to bust the windshield. M.R. climbed back into the rear seating area and also began to beat on the rear passenger window repeatedly and violently with his tablet until he shattered the window. M.R. exited the vehicle by reaching outside to the door handle and opening the door. Before that, he threw his shoes out the broken window.

(31) By this time, a crowd had gathered, and Redd's grandmother (age 75) also pulled into the parking lot. Redd and her grandmother attempted to deescalate M.R. but without success. M.R. began shoving Redd and then charged at Redd, pushing her into the side of a building. After Redd's elderly grandmother attempted to intervene, M.R. also raised his hand to hit Redd's elderly grandmother. Redd managed to stop M.R. from hitting Redd's elderly grandmother, but then M.R. turned his attention back to Redd and punched her in the face.

(32) Bystanders, who had gathered in the parking lot, attempted to stop M.R. from hitting Redd and scolded him for hitting his mother. M.R.'s response was to begin picking up some of the broken glass from the shattered passenger window and throwing it at the bystanders. By this time, the police arrived in response to having been called by one of the bystanders. M.R. was detained by the police.

(33) Redd and her grandmother were told by the police officers that their protocol for behavioral outbursts was to transport the person to PHR. However, Redd and her grandmother explained to the police officers that PHR had declined to provide treatment to M.R. several times. Redd begged the police officers to take M.R. somewhere else. Redd was told by the police officers that there was nowhere else to take M.R. In

9

desperation, Redd called M.R.'s psychiatrist's office crisis line and was told she could bring M.R. to their office to determine if a therapist was available to see M.R. The police officers took M.R. to his psychiatrist's office and waited with the family. Unfortunately, a therapist was not available. After a Safety Plan was constructed by the psychiatrist's office, the police officers took M.R. to Redd's family home.

(34) On 4/17/2022, while Redd was at a gas station, M.R. broke the rear window of Redd's car and hit Redd in the mouth with a large rock, busting Redd's lips. M.R. was arrested at the scene. On 4/22/2022, M.R. was again arrested at his elementary school for attacking Redd after Redd did not give M.R. more hashbrowns after he ate his breakfast.

(35) On 4/26/2022, M.R. was arrested for a third time after he tried to break into Redd's room with the metal bar of his bed frame. M.R. broke through Redd's bedroom door with the metal bar. M.R. slashed Redd's leg with the metal bar, put holes in the walls of the bedroom, and did damage to other parts of the apartment.

(36) On 5/12/2022, M.R. was arrested for a fourth time. M.R. fought Redd at home and did more damage to the apartment, including breaking out his bedroom window. M.R. then ran outside to the playground with a piece of glass. This incident resulted in M.R. being detained overnight at the Allen County Juvenile Center ("ACJC"). The following day, after a court proceeding, M.R. was transferred to the Youth Services Center ("YSC"). M.R. was held at YSC until he was admitted to Damar Services in Indianapolis for a 30–60-day diagnostic and evaluation ("D&E"). As a result of the D&E, M.R. was recommended for long-term residential treatment at Damar Services due to the increasingly dangerous level of M.R.'s unsafe behaviors.

(37) Since the 5/1/2021 incident at PBH involving Biddle and the denial of services by PBH, among the damages suffered by Redd, involved the financial, emotional, and physical impact of having to place M.R. at a facility located in Indianapolis, Indiana (Damar Services). M.R. was placed with Damar Services beginning on May 23, 2022. Redd has paid out-of-pocket expenses, such as mileage to visit M.R. in Indianapolis when she could afford to do so, damages to her car and home from the damage caused by M.R., lost wages, hotel stays in Indianapolis to visit her son, safety equipment purchased, medical expenses for injuries sustained from M.R., and psychiatric expenses (antidepressants and anti-anxiety medications). Redd and M.R. have also suffered mental and emotional distress. Redd has lost the affection of her son. Redd has also suffered trauma as a result of the fact her son attacked and threatened to kill her on several occasions.

(38) Since the 5/1/2021 incident at PBH involving Biddle and the denial of services by PBH, among the damages M.R. has suffered, include a myriad of behavior changes (increased aggression and violence and suicidal thoughts), physical and emotional injury while in a safe space designed to heal, loss of the bond with his mother, loss of peace of mind, emotional distress, loss of stability in himself and the home, interruption in schooling, being arrested four times, and a loss of a home environment.

**FIRST CLAIM FOR RELIEF**

(39) Redd repeats and realleges each and every allegation in paragraphs numbered 1 through 38 of this complaint with the same force and effect as if fully set forth herein.

(40) PHSI's conduct subjected Redd to a pattern or practice of disparate treatment based on race relative to terms, conditions, and privileges of contract for public services resulting in physical, emotional, and monetary damages, in violation of Section 1981.

(41) PHSI's conduct was intentional and also reflects malice or reckless disregard for the federal statutory civil rights of Redd.

(42) As a result of PHSI's conduct, Redd is now suffering and will continue to suffer irreparable injury and monetary damages, unless and until, this Court grants relief.

## SECOND CLAIM FOR RELIEF

(43) Redd repeats and realleges each and every allegation in paragraphs numbered 1 through 38 of this complaint with the same force and effect as if fully set forth herein.

(44) PHSI's conduct subjected Redd to physical, emotional, and monetary damages, in violation of Indiana Common Law Claims of Breach of Contract and a Breach of the Covenant of Good Faith and Fair Dealing.

(45) PHSI's conduct was intentional and also reflects malice or reckless disregard for the common law rights of Redd.

(46) As a result of PHSI's conduct, Redd is now suffering and will continue to suffer irreparable injury and monetary damages, unless and until, this Court grants relief.

## THIRD CLAIM FOR RELIEF

(47) Redd repeats and realleges each and every allegation in paragraphs numbered 1 through 38 of this complaint with the same force and effect as if fully set forth herein.

(48) PHSI's conduct subjected Redd to physical, emotional, and monetary damages, in violation of Indiana Common Law of Intentional Infliction of Emotional Distress.

(49) PHSI's conduct was intentional and also reflects malice or reckless disregard for the common law rights of Redd.

(50) As a result of PHSI's conduct, Redd is now suffering and will continue to suffer irreparable injury and monetary damages, unless and until, this Court grants relief.

## FOURTH CLAIM FOR RELIEF

(51) Redd repeats and realleges each and every allegation in paragraphs numbered 1 through 38 of this complaint with the same force and effect as if fully set forth herein.

(52) PHSI's conduct subjected Redd to physical, emotional, and monetary damages, in violation of Indiana Common Law of Assault and Battery.

(53) PHSI's conduct was intentional and also reflects malice or reckless disregard for the common law rights of Redd.

(54) As a result of PHSI's conduct, Redd is now suffering and will continue to suffer irreparable injury and monetary damages, unless and until, this Court grants relief.

## FIFTH CLAIM FOR RELIEF

(55) Redd repeats and realleges each and every allegation in paragraphs numbered 1 through 38 of this complaint with the same force and effect as if fully set forth herein.

(56) PHSI's conduct subjected Redd to physical, emotional, and monetary damages, in violation of Indiana Common Law of Negligent Hiring or Retention in Employment.

(57) PHSI's conduct was intentional and also reflects malice or reckless disregard for the common law rights of Redd.

(58) As a result of PHSI's conduct, Redd is now suffering and will continue to suffer irreparable injury and monetary damages, unless and until, this Court grants relief.

## SIXTH CLAIM FOR RELIEF

(59) Redd repeats and realleges each and every allegation in paragraphs numbered 1 through 38 of this complaint with the same force and effect as if fully set forth herein.

(60) PHSI's conduct subjected Redd to retaliatory treatment relative to terms, conditions, and privileges in a public service after she filed a complaint of racial discrimination with the Indiana Civil Rights Commission resulting in physical, emotional, and monetary damages, in violation of Section 1981.

(61) PHSI's conduct was intentional and also reflects malice or reckless disregard for the federal and state civil rights of Redd.

(62) As a result of PHSI's conduct, Redd is now suffering and will continue to suffer irreparable injury and monetary damages, unless and until, this Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, Redd respectfully requests that this Court enter a judgment:

(a) Declaring that the acts and practices complained of herein are in violation of rights provided to Redd by Federal and State Law;

(b) Enjoining and permanently restraining these violations of Redd's rights;

(c) Directing PHSI and Biddle to take steps to make Redd whole for all losses whether monetary or otherwise;

(e) Awarding Redd compensatory and punitive damages for the injuries suffered as a result of PHSI and Biddle's violations of Redd's rights;

(f) Awarding Redd the costs of this action together with reasonable attorney's fees, as provided by law;

(g) Directing PHSI and Biddle to pay Redd prejudgment and post-judgment interest on all sums recovered;

and

(h) Granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

Redd, on her own behalf and on behalf of a minor, M.R., pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, demands a trial by jury in this action.

__Bobby A Potters_____
Bobby A Potters #6347-49
Attorney at Law
3272 Hooker Street
Plainfield, IN 46168
317-679-9665
bpotters@tds.net

Attorney for Shanita Redd
On behalf of a Minor (M.R.) and
Shanita L. Redd on her own behalf